[561 U.S. 945]

DEMARCUS ALI SEARS, Petitioner

v

STEPHEN UPTON, WARDEN

561 U.S. 945, 130 S. Ct. 3259, 177 L. Ed. 2d 1025, 2010 U.S. LEXIS 5540

[No. 09-8854]

Decided June 29, 2010.

**OPINION OF THE COURT**

[561 U.S. 945]

## Per Curiam.

According to an expert who testified during state postconviction relief, petitioner Demarcus A. Sears performs at or

[561 U.S. 946]

below the bottom first percentile in several measures of cognitive functioning and reasoning. The cause of this abnormality appears to be significant frontal lobe brain damage Sears suffered as a child, as well as drug and alcohol abuse in his teens. But because—in the words of the state trial court—his counsel conducted a penalty phase investigation that was "on its face . . . constitutionally inadequate," App. to Pet. for Cert. 27B, evidence relating to Sears' cognitive impairments and childhood difficulties was not brought to light at the time he was sentenced to death.

After finding constitutionally deficient attorney performance under the framework we set forth in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the state postconviction court found itself unable to assess whether counsel's inadequate investigation might have prejudiced Sears. App. to Pet. for Cert. 29B–30B. Because Sears' counsel did present *some* mitigation evidence during Sears' penalty phase— but not the significant mitigation evidence a constitutionally adequate investigation would have uncovered— the state court determined it could not speculate as to what the effect of additional evidence would have been. *Id.*, at 30B. Accordingly, it denied Sears postconviction relief. *Id.*, at 34B. Thereafter, the Supreme Court of Georgia summarily denied review of his claims. *Id.*, at 1A.

1028

For the reasons that follow, it is plain from the face of the state court's opinion that it failed to apply the correct prejudice inquiry we have established for evaluating Sears' Sixth Amendment claim. We therefore grant the petition for writ of certiorari, vacate the judgment, and remand for further proceedings not inconsistent with this opinion.[1]

[561 U.S. 947]

I

In 1993, a Georgia jury convicted Sears of armed robbery and kidnaping with bodily injury (which also resulted in death), a capital crime under state law. See Ga. Code Ann. § 16–5–40(d)(4) (2006).[2] During the penalty phase of Sears' capital trial, his counsel presented evidence describing his childhood as stable, loving, and essentially without incident. Seven witnesses offered testimony along the following lines: Sears came from a middle-class background; his actions shocked and dismayed his relatives; and a death sentence, the jury was told, would devastate the family. See Pet. for Cert. 6–7. Counsel's mitigation theory, it seems, was calculated to portray the adverse impact of Sears' execution on his family and loved ones. 20 Record 5181. But the strategy backfired. The prosecutor ultimately used the evidence of Sears'

purportedly stable and advantaged upbringing against him during the State's closing argument. With Sears, the prosecutor told the jury, "[w]e don't have a deprived child from an inner city; a person who[m] society has turned its back on at an early age. But, yet, we have a person, privileged in every way, who has rejected every opportunity

[561 U.S. 948]

that was afforded him." Pet. for Cert. 7–8 (quoting trial transcript; internal quotation marks omitted).

The mitigation evidence that emerged during the state postconviction evidentiary hearing, however, demonstrates that Sears was far from "privileged in every way." Sears' home life, while filled with material comfort, was anything but tranquil: His parents had a physically abusive relationship, Exh. 26, 6 Record 1676 (Affidavit of Demetrius A. Sears), and divorced when Sears was young, Exh. 22, id., at 1654 (Affidavit of Virginia Sears Graves); he suffered sexual abuse at the hands of an adolescent male cousin, Exh. 26, id., at 1681–1682; his mother's "favorite word for referring to her sons was 'little mother fuckers,'" Exh. 3, 2 id., at 265 (Affidavit of Richard G. Dudley, Jr., M. D.); and his father was "verbally abusive," Exh. 37, 6 id., at 1746–1747 (Affidavit of Carol Becci-

---

1. Although this is a state-court decision, it resolved a federal issue on exclusively federal-law grounds. We therefore have jurisdiction. 28 U.S.C. § 1257; see also *Padilla* v. *Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010) (reviewing state postconviction decision raising Sixth Amendment question).

2. Sears was sentenced to death for the Kentucky murder of a woman whom he and an accomplice kidnaped in Georgia. Under Georgia law, a jury may "impose a death sentence for the offense of kidnapping with bodily injury on the ground that the offense of kidnapping with bodily injury was committed while the offender was engaged in the commission of the capital felon[y] of murder . . . ." *Potts* v. *State*, 261 Ga. 716, 720, 410 S.E.2d 89, 93 (1991). So long as "the murder . . . [is] sufficiently a part of the same criminal transaction," it may count as a "statutory aggravating circumstanc[e] of the offense of kidnapping with bodily injury." *Ibid.*, 410 S.E.2d, at 94. Sears has raised a categorical Eighth Amendment challenge to the constitutionality of his death sentence for a kidnaping offense, which we decline to reach. And any jurisdictional or constitutional issue with respect to Georgia's ability to execute Sears for a murder occurring in Kentucky is not before us.

Youngs),[3] and disciplined Sears with age-inappropriate military-style drills, Exh. 3, 2 *id.*, at 263–264; Exh. 19, 6 *id.*, at 1622 (Affidavit of Frank Sears); Exh. 22, *id.*, at 1651; Exh. 28, *id.*, at 1694 (Affidavit of Kenneth Burns, Sr.). Sears struggled in school, demonstrating substantial behavior problems from a very young age. For example, Sears repeated the second grade, Exh. 6, 3 *id.*, at 500–501, and was referred to a local health center for evaluation at age nine, Exh. 7, *id.*, at 503, 504, 508. By the time Sears reached high school, he was "described as severely learning disabled and as severely behaviorally handicapped." Exh. A to Exh. 1, 2 *id.*, at 174–176 (Affidavit of Tony L. Strickland, M. S., Ph. D.).

[561 U.S. 949]

Environmental factors aside, and more significantly, evidence produced during the state postconviction relief process also revealed that Sears suffered "significant frontal lobe abnormalities." Exh. 1, *id.*, at 147. Two different psychological experts testified that Sears had substantial deficits in mental cognition and reasoning—*i.e.*, "problems with planning, sequencing and impulse control," *ibid.*—as a result of several serious head injuries he suffered as a child, as well as drug and alcohol abuse. See 1 Record 37–40 (Testimony of Dr. Strickland); *id.*, at 95–96 (Testimony of Dr. Dudley). Regardless of the cause of his brain damage, his scores

on at least two standardized assessment tests placed him at or below the first percentile in several categories of cognitive function, "making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli." Exh. 1, 2 *id.*, at 148; see also 1 *id.*, at 37. The assessment also revealed that Sears' "ability to organize his choices, assign them relative weight and select among them in a deliberate way is grossly impaired." Exh. 1, 2 *id.*, at 149. From an etiological standpoint, one expert explained that Sears' "history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected" to lead to these significant impairments. *Id.*, at 150; see also 1 *id.*, at 44.

Whatever concern the dissent has about some of the sources relied upon by Sears' experts—informal personal accounts, see *post*, at 960–963, 177 L. Ed. 2d, at 1037-1039 (opinion of Scalia, J.)—it does not undermine the well-credentialed expert's assessment,[4] based

[561 U.S. 950]

on between 12 and 16 hours of interviews, testing, and observations, see 1 Record 32, that Sears suffers from substantial cognitive impairment. Sears performed dismally on several of the forensic tests administered to him to assess

---

**3.** In the particular instance recounted in this affidavit, Sears' art teacher stated that his father "berate[d] [him] in front of" the school principal and her during a parent-teacher conference. Exh. 37, 6 Record 1746. The event was significant: "I'll never forget the way he bullied him," the art teacher explained, "Mr. Sears was so verbally abusive and made such a scene, that it made everyone in the room uncomfortable." *Ibid.* The art teacher had "never been in a conference where a parent severely criticized a child in the presence of his teachers and meant it, as Mr. Sears did." *Id.*, at 1747.

**4.** Dr. Strickland, a psychologist, is the director of a mild head injury clinic and the Sports Concussion Institute at Centinella Freeman Medical Center in Los Angeles. 1 *id.*, at 30. He is an associate professor of psychiatry in residence at the University of California at Los Angeles and directs a memory disorder and cerebral palsy clinic for that university's department of neuroscience. *Id.*, at 30–31. The State had no objection to his being tendered as an expert in neuropsychology. *Id.*, at 31.

his frontal lobe functioning. On the Stroop Word Interference Test, which measures response inhibition, *id.*, at 36–37, 99.6% of those individuals in his cohort (which accounts for age, education, and background) performed better than he did. *Ibid.* On the Trail-Making B test, which also measures frontal lobe functioning, *id.*, at 37–38, Sears performed at the first (and lowest) percentile. *Id.*, at 38. Based on these results, the expert's firsthand observations, and an extensive review of Sears' personal history, the expert's opinion was unequivocal: There is "clear and compelling evidence" that Sears has "pronounced frontal lobe pathology."[5] *Id.*, at 68.

Further, the fact that Sears' brother is a convicted drug dealer and user, and introduced Sears to a life of crime, 6 *id.*, at 1683–1686, actually would have been consistent with a mitigation theory portraying Sears as an individual with diminished judgment and reasoning skills, who may have desired to follow in the footsteps of an older brother who had shut him out of his life, *post*, at 962, 177 L. Ed. 2d, at 1038. And the fact that some of

such evidence may have been "hearsay" does not necessarily undermine its value—or its admissibility—for penalty phase purposes.[6] *Post*, at 961, n. 3, 177 L. Ed. 2d, at 1037–1038.

[561 U.S. 951]

Finally, the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, *post*, at 962–963, 177 L. Ed. 2d, at 1038–1039, given that counsel's initial mitigation investigation was constitutionally inadequate. Competent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, *ibid.*, were features, in another well-credentialed expert's view,[7] of a "profound personality disorder." 1 Record 104. This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts—especially in light of his purportedly stable upbringing.

---

**5.** During a colloquy with the court, Dr. Strickland further explained:

"THE COURT: But by taking some history of head injuries, coupled with the results of the tests that you've given, you can comfortably conclude that the results of the tests that you've given were a consequence of frontal lobe head injuries?

"THE WITNESS: Absolutely. And, moreover, Your Honor, the patient has a lesion on the front of his head, which is something I can observe." *Id.*, at 78.

**6.** ■ Like Georgia's "necessity exception" to its hearsay rules, see Ga. Code Ann. § 24–3–1(b) (2006), we have also recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule. See *Green* v. *Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) *(per curiam)* ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause . . . . The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial"); see also *Chambers* v. *Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) ("In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice"). We take no view on whether the evidence at issue would satisfy the considerations we set forth in *Green*, or would be otherwise admissible under Georgia law.

**7.** Dr. Dudley, a psychiatrist, completed his internship and residency at Northwestern University Medical Center, and has been board certified in psychiatry by the American Board of Psychiatry and Neurology for more than 35 years. 1 Record 91–92. The State also had no objection to his being tendered as an expert in psychiatry. *Id.*, at 93.

Because they failed to conduct an adequate mitigation investigation, *none* of this evidence was known to Sears' trial counsel. It emerged only during state postconviction relief.

## II

Unsurprisingly, the state postconviction trial court concluded that Sears had demonstrated his counsel's penalty phase investigation was constitutionally deficient. See *Strickland*, 466 U.S., at 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (explaining that ▮ first inquiry

**[561 U.S. 952]**

when evaluating Sixth Amendment ineffectiveness claim is whether counsel's representation "fell below an objective standard of reasonableness"). In its view, the cursory nature of counsel's investigation into mitigation evidence—"limited to one day or less, talking to witnesses selected by [Sears'] mother"—was "on its face . . . constitutionally inadequate." App. to Pet. for Cert. 27B.

What is surprising, however, is the court's analysis regarding whether counsel's facially inadequate mitigation investigation prejudiced Sears. See *Strickland, supra*, at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Although the court appears to have stated the proper prejudice standard,[8] it did not correctly conceptualize how that standard applies to the circumstances of this case. Because Sears' counsel did present some mitigation evidence during his penalty phase, the court concluded that "[t]his case cannot be fairly compared with those where little or no mitigation evidence is presented and where a reasonable prediction of outcome can be made." App. to Pet. for Cert. 30B. The court explained that "it is impossible to know what effect [a different mitigation theory] would have had on [the jury]." *Ibid.* "Because counsel put forth a reasonable theory with supporting evidence," the court reasoned, "[Sears] . . . failed to meet his burden of proving that there is a reasonable likelihood that the outcome at trial would have been different if a different mitigation theory had been advanced."[9] *Ibid.*

**[561 U.S. 953]**

There are two errors in the state court's analysis of Sears' Sixth Amendment claim. First, the court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory. The court's determination that counsel had conducted a constitutionally deficient mitigation investigation should have, at the very least, called into question the reasonableness of this theory. Cf. *Wiggins* v. *Smith*, 539 U.S.

---

8. The court asked whether "there is a reasonable likelihood that the outcome of his trial would have been different if his counsel had done more investigation." App. to Pet. for Cert. 29B–30B; see *Strickland*, 466 U.S., at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (▮ "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome").

9. Channeling powers of telepathy, Justice Scalia asserts that what the trial court actually decided in this case is that "Sears' trial counsel presented a reasonable mitigation theory and offered evidence sufficient to support it, so the prejudice inquiry was more difficult—so difficult that Sears could not make the requisite showing." *Post*, at 960, 177 L. Ed. 2d, at 1037. Such a highly favorable reading of the trial court's analysis would be far more convincing had the trial court engaged with the evidence as Justice Scalia does. But it offered no such analysis in its opinion; indeed, it appears the court did not even conduct any real analysis, explaining that it was "*impossible* to know what effect" the evidence might have had on the jury. App. to Pet. for Cert. 30B (emphasis added).

510, 522, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (explaining that "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background' " (quoting *Williams* v. *Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); alteration in original)). And, more to the point, ▮ that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears. The "reasonableness" of counsel's theory was, at this stage in the inquiry, beside the point: Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not.

Justice Scalia chides the Court for concluding that the trial court assumed, rather than found, that counsel's mitigation theory was a reasonable one. *Post*, at 957, 177 L. Ed. 2d, at 1035. But our point is that ▮ any finding with respect to the reasonableness of the mitigation theory counsel utilized—in this case, family impact—is in tension with the trial court's unambiguous finding

[561 U.S. 954]

that counsel's investigation was itself so unreasonable as to be facially uncon-

stitutional. This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy—in that case, petitioner's voluntary confession—was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S., at 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case.[10]

Second, and more fundamentally, the court failed to apply the proper prejudice inquiry. ▮ We have never limited the prejudice inquiry under *Strickland* to cases in which there was only "little or no mitigation evidence" presented, App. to Pet. for Cert. 30B. True, we have considered cases involving such circumstances,[11] and we have explained that there is no prejudice when the new mitigating evidence "would barely have altered the sentencing profile presented" to the decisionmaker, *Strickland*, 466 U.S., at 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674. But we also have found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase. *E.g.*, *Williams*, *supra*, at 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (remorse and cooperation with police); *Rompilla* v. *Beard*, 545 U.S. 374, 378, 125 S. Ct. 2456, 162 L. Ed.

---

10. Moreover, ▮ the reasonableness of the theory is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory. This point was also plain in *Williams:* "Whether or not . . . omissions [in the investigation] were sufficiently prejudicial to have affected the outcome of sentencing," they may nevertheless demonstrate deficiency. 529 U.S., at 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389. The one inquiry, deficient mitigation investigation, is distinct from the second, whether there was prejudice as a result.

11. See, *e.g.*, *Wiggins* v. *Smith*, 539 U.S. 510, 515–516, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Strickland* v. *Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

2d 360 (2005) (residual doubt). We did so most recently in *Porter*

[561 U.S. 955]

v. *McCollum*, 558 U.S. 30, 32, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) *(per curiam)*, where counsel at trial had attempted to blame his client's bad acts on his drunkenness, and had failed to discover significant mitigation evidence relating to his client's heroic military service and substantial mental health difficulties that came to light only during postconviction relief, *id.*, at 40–41, 130 S. Ct. 447, 175 L. Ed. 2d 398. Not only did we find prejudice in *Porter*, but—bound by deference owed under 28 U.S.C. § 2254(d)(1)—we also concluded the state court had *unreasonably* applied *Strickland*'s prejudice prong when it analyzed Porter's claim. *Porter*, *supra*, at 42, 130 S. Ct. 447, 175 L. Ed. 2d 398.

■ We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below.[12] In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the state court in this case. 529 U.S., at 397–398, 120 S. Ct.

1495, 146 L. Ed. 2d 389. And, in *Porter*, we recently explained:

"To assess [the] probability [of a different outcome under *Strickland*], we consider the totality of the available

[561 U.S. 956]

mitigation evidence— both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." 558 U.S., at 41, 130 S. Ct. 447, 175 L. Ed. 2d 398 (internal quotation marks omitted; third alteration in original).

That same standard applies—and will necessarily require a court to "speculate" as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase. Indeed, it is exactly this kind of probing inquiry that Justice Scalia now undertakes, *post*, at 960–964, 177 L. Ed. 2d, at 1037-1039, and that the trial court failed to do. In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

III

A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' "significant" mental and psychological impairments, along with the mitigation evidence introduced

---

12. Whether it did so implicitly is far from apparent, notwithstanding Justice Scalia's suggestion to the contrary. See *post*, at 959–960, 177 L. Ed. 2d, at 1036-1037. The trial court stated that the record was "largely silent" on "what [evidence] would have been shown if [additional mitigating evidence] had been sought." App. to Pet. for Cert. 28B. This is a curious assertion in light of the 22 volumes of evidentiary hearing transcripts and submissions in the record, which spell out the findings discussed above. It also undermines any suggestion that the court did, in fact, do the reweighing Justice Scalia believes it undertook; it is plain the record is not "largely silent." And it also undermines any suggestion that the court simply discounted the value of the testimony; had it made any such finding, the court could have easily stated, instead, that the record evidence was unpersuasive.

during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation. See *Porter*, *supra*, at 40, 130 S. Ct. 447, 175 L. Ed. 2d 398; *Williams*, *supra*, at 397–398, 120 S. Ct. 1495, 146 L. Ed. 2d 389; *Strickland*, *supra*, at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674. It is for the state court—and not for either this Court or even Justice Scalia—to undertake this reweighing in the first instance.

Accordingly, the petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment below is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

The **Chief Justice** and Justice **Alito** would deny the petition for a writ of certiorari.

## SEPARATE OPINION

[561 U.S. 957]
Justice **Scalia**, with whom Justice **Thomas** joins, dissenting.

The Court concludes, *ante*, at 951–956, 177 L. Ed. 2d, at 1032-1034, that the Superior Court of Butts County, Georgia, made errors of law in applying the prejudice inquiry for ineffective-assistance-of-counsel claims under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In my view there was no error of law, and the Court today remands for the state court to do what it has already done: find no reasonable likelihood that the mitigation evidence the Court details in its opinion would have persuaded a jury to change its mind about the death sentence for this brutal rape-murder.

The state habeas court responsibly executed the first step in the *Strickland* analysis, finding that the investigation of mitigation evidence by Sears' trial counsel was deficient performance. The issue here is the second step: whether Sears was prejudiced by that deficiency. As the Court acknowledges, *ante*, at 952, 177 L. Ed. 2d, at 1032, the state habeas court correctly stated the prejudice standard under *Strickland:* The defendant has the burden to establish "a reason-

able probability that, but for counsel's deficient performance, the result of the proceeding would have been different." App. to Pet. for Cert. 24B–25B (citing 466 U.S., at 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674). "When applied to the sentencing phase of death penalty trials," that means "a reasonable probability that, absent [counsel's] errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." App. to Pet. for Cert. 25B–26B.

The Court today concludes that there were two errors in the *application* of that proper standard. First, it reasons that the court erroneously "curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory" at trial. *Ante*, at 953, 177 L. Ed. 2d, at 1032. That argument is flawed on several levels. To begin with, the state habeas court did not *assume* trial counsel's mitigation theory was reasonable; it *found* that it was.

[561 U.S. 958]

It said: "[A]lthough counsel failed to investigate thoroughly, they did develop a

**1035**

reasonable mitigation theory with evidence to support it." App. to Pet. for Cert. 30B. After interviews of roughly a dozen potential mitigation witnesses, who, with the exception of Sears' father, gave positive accounts of Sears and his family, see 7 Record 2025, 2051–2052; 8 *id.,* at 2129, 2291–2344, Sears' trial counsel developed a mitigation theory that Sears came from a good family and had a solid middle-class upbringing; that his offense was completely out of character; that he cooperated with police; and that sentencing Sears to death would devastate his family and friends, see *id.,* at 2124–2125; 19 *id.,* at 4861–4862, 4916–4917, 4954–4955; 20 *id.,* at 5181. To support that approach his attorneys called seven witnesses, including Sears' mother, four family friends, and his high school guidance counselor. See Pet. for Cert. 6–7 (citing trial transcript pages between 2375 and 2451). The state habeas court did not declare that this mitigation theory "might be reasonable, in the abstract," as the Court puts it, *ante,* at 953, 177 L. Ed. 2d, at 1033. Rather, it concluded that counsel "put forth a reasonable theory with supporting evidence." App. to Pet. for Cert. 30B.

The Court's argument is also flawed because the habeas court's reasonableness finding did *not* cause it to "curtai[l]" its prejudice inquiry, or lead to the conclusion that it could "obviate the need to analyze" whether pursuing a different mitigation theory would have made a difference. *Ante,* at 953, 177 L. Ed. 2d, at 1033. The

reasonableness finding merely meant that the prejudice determination had to be made by asking, not whether the jury's mind would probably have been changed by hearing Sears' new mitigation theory instead of hearing no mitigation theory at all; but rather whether it would probably have been changed by substituting Sears' new mitigation theory for the reasonable mitigation theory that was presented and rejected.[1] After hearing all the witnesses

[561 U.S. 959]

and other evidence Sears presented before it, the state court concluded that "it is just not possible to know what effect a *different* mitigation theory would have had." App. to Pet. for Cert. 30B (emphasis added).[2]

The second, "and more fundamenta[l]," legal error the Court alleges, *ante,* at 954, 177 L. Ed. 2d, at 1033, is really encased within the first. The Court claims that the state habeas court "limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented." *Ibid.* (quoting App. to Pet. for Cert. 30B). The court erred, we are told, by determining that "present[ation of] *some* mitigation evidence should foreclose an inquiry into whether" Sears was prejudiced. *Ante,* at 955, 177 L. Ed. 2d, at 1034. That is not a fair reading of the opinion. The state court did not hold that a defendant could never suffer prejudice whenever his counsel provided *any* mitigation evidence. Rather, it stated that "[t]his

1. The Court contends, *ante,* at 953, 177 L. Ed. 2d, at 1033, that there was a "tension" between the state court's conclusion that the investigation was deficient and its conclusion that the mitigation theory presented to the jury was reasonable. This terribly misreads the state court's opinion. It did not say (as the Court's point assumes) that counsel's *using* the mitigation theory they did was reasonable; it said that the *theory itself* was reasonable, making it hard to say whether a different theory would have persuaded the jury. This presents no conceivable "tension."

2. On the fair reading we owe the state court, its opinion provides no basis for inferring that it failed to "engag[e] with the evidence" and "did not even conduct any real analysis." *Ante,* at 953, n. 9, 177 L. Ed. 2d, at 1032.

case *cannot be fairly compared* with those where little or no mitigation evidence is presented and where a reasonable prediction of outcome can be made." App. to Pet. for Cert. 30B (emphasis added). That is absolutely correct. This case is not like the prejudice cases on which the Court relies, where it could readily be said that the overlooked mitigation theory would have made a much deeper impression on the jury than the utterly unsupported theory (or absence of any theory) offered at trial. See *Porter* v. *McCollum*, 558 U.S. 30, 41, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) *(per curiam)*; *Rompilla* v. *Beard*, 545 U.S. 374, 378, 393, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); *Wiggins* v. *Smith*, 539 U.S. 510,

[561 U.S. 960]

515, 537, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Williams* v. *Taylor*, 529 U.S. 362, 369, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Sears' trial counsel presented a reasonable mitigation theory and offered evidence sufficient to support it, so the prejudice inquiry was more difficult—so difficult that Sears could not make the requisite showing. Clearly referring to the evidence in this particular case, the court said:

"Although here, the Petitioner can argue that a prior appeal shows the difficulty one juror was having reaching the same verdict as the others, it is just not possible to know what effect a different mitigation theory would have had on her, just as it is impossible to know what effect it would have had on other jurors." App. to Pet. for Cert. 30B.

Since the habeas court made no legal error en route to its *Strickland* conclusion, the only basis for reversing the judgment here would be disagreement with the conclusion itself: that Sears had not established that his new mitigation theory would probably have caused the jury to impose a life sentence instead of death.

The Court makes no attempt to contradict that conclusion. Doing so would require a fact-intensive inquiry into the 22-volume record to measure the persuasiveness of the evidence supporting Sears' new mitigation theory—an inquiry the Court purports to disavow, *ante*, at 956, 177 L. Ed. 2d, at 1034, but nonetheless tendentiously undertakes, *ante*, at 948–950, 177 L. Ed. 2d, at 1029-1031. The reader might think the state habeas court's conclusion highly questionable from the Court's account, which recites as solid all the evidence supporting Sears' new mitigation theory, see *ante*, at 948–551, 177 L. Ed. 2d, at 1029-1032. It is far from solid. Some is likely inadmissible as unreliable hearsay under Georgia law, see *Gissendaner* v. *State*, 272 Ga. 704, 714, 532 S.E.2d 677, 688–689 (2000); *Gulley* v. *State*, 271 Ga. 337, 347, 519 S.E.2d 655, 664 (1999)—such as much of the evidence for the uncorroborated second-hand claim that Sears "suffered sexual abuse at the hands of

[561 U.S. 961]

an adolescent male cousin," *ante*, at 948, 177 L. Ed. 2d, at 1029.[3] Other evidence a competent attorney would likely not have placed before the jury—such as all the

---

**3.** The Court's reliance on *Green* v. *Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979) *(per curiam)*, *ante*, at 950–951, n. 6, 177 L. Ed. 2d, at 1031, to suggest that this unreliable hearsay would be admissible for sentencing purposes is entirely misplaced. In *Green*, we held it violated constitutional due process to exclude testimony regarding a co-conspirator's confession that he alone committed the capital murder with which the defendant was charged. Our holding depended on "th[e] unique circumstances" of the case: The testimony to be used at sentencing was "highly relevant" and "substantial[ly]" reliable as a statement against penal interest made to a close friend; it was corroborated by "ample" evidence and was used by the State to obtain a

testimony about Sears' childhood from his brother Demetrius, an admitted drug dealer and drug user, 6 Record 1682–1684, 1695, 1752, and a convicted felon (for bank fraud, wire fraud, identity theft, and cocaine trafficking), *id.,* at 1687. No juror would have been impressed by such a character witness.

Some of the evidence is incredible, such as the psychiatrist's assertion that Sears had "substantial deficits in mental cognition and reasoning . . . as a result of several serious head injuries he suffered as a child," *ante,* at 949, 177 L. Ed. 2d, at 1030. The serious head injuries consisted of Sears' hitting his head at a roller-skating rink sometime early in elementary school, 1 Record 76; 2 *id.,* at 225, running into an end table as a child, 6 *id.,* at 1651, and getting hit with a golf club sometime later in elementary school, 1 *id.,* at 79; 2 *id.,* at 225.[4] (The last of

**[561 U.S. 962]**

these major injuries might not have been introduced anyway, since that would have provided the prosecution an opportunity to refute both the extent of the injury and the mercy-worthiness of Sears, by introducing into evidence Sears' boast that when he was 11 or 12 he "beat the s*** out of" someone after he was hit on the head with a golf club, 8 *id.,* at 2195.) Likewise incredible was the assertion that Demetrius "introduced Sears to a life of crime," *ante,* at 950, 177 L. Ed. 2d, at 1031. According to

testimony on which the Court relies, Demetrius would "never let [Sears] hang around" with him and his drug-dealing friends. 6 Record 1685–1686.

A jury also would have discredited the psychiatric testimony of Dr. Strickland that "[f]rom an etiological standpoint . . . Sears' 'history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected' to lead to these significant [mental] impairments," *ante,* at 949, 177 L. Ed. 2d, at 1030 (quoting 2 Record 150). As already noted, the evidence of brain-damaging trauma is nonexistent. The psychiatric testimony of Dr. Dudley relied upon the self-interested reporting of Sears himself and the testimony of his less-than-trustworthy brother, Demetrius, see, *e.g.,* 1 *id.,* at 122, 133. And then there are the unfavorable parts of Dr. Dudley's testimony: Sears is a "narcissis[t]," *id.,* at 135, with a "grandiose" opinion of himself, *id.,* at 98–99; 2 *id.,* at 246. Dr. Dudley's affidavit portrays Sears as arrogant and self-centered, *id.,* at 246, 247, and notes what he termed Sears' "fantastical" boasting of his first sexual experience with a woman at the age of six and his other "innumerable sexual experiences," 1 *id.,* at 98–99, 100; 2 *id.,* at 246–247. It is hard to see how it could be thought probable that Sears' so-called "magical thinking," 1 *id.,* at 84, would have helped his plea for leniency, see *ante,* at 951, 177 L. Ed. 2d, at 1031. It seems to me more likely the

conviction in a separate trial against the co-conspirator. 442 U.S., at 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738. Here there are no such circumstances. The testimony is uncorroborated secondhand reporting from self-interested witnesses that is unreliable and therefore likely inadmissible.

**4.** There is an unsubstantiated claim from Sears himself, 8 Record 2195, that when he was a teenager he was hit with a "hatchet" above his right eye. Of course, that is the same place where he collided with an end table, 6 *id.,* at 1651, leaving the "lesion"—better known as a scar—on his head that Dr. Strickland noted, *ante,* at 950, n. 5, 177 L. Ed. 2d, at 1031 (quoting 1 Record 78). There is no corroborating evidence for this event: no medical records, 1 *id.,* at 77, no other apparent scars, 2 *id.,* at 245; 6 *id.,* at 1651, and, tellingly, no family or friends to confirm what surely would have been memorable had it happened.

jury would conclude that Sears' "profoun[d] personality

[561 U.S. 963]

disorder," 1 Record 104, made him exactly the kind of person who would commit heinous crimes in the future.

And some of the evidence the Court recounts is so utterly unlikely to affect a jury's determination that this brutal murder deserved death that its recitation is just plain hilarious. For example, the claim that Sears' father "was 'verbally abusive,' " *ante*, at 948, 177 L. Ed. 2d, at 1029, resting on nothing more than an art teacher's recollection that Sears' father "severely criticized" him—"and meant it"!—at a conference with the principal concerning his son's poor academic performance, 6 Record 1747; the claim that his father "disciplined Sears with age-inappropriate military-style drills," *ante*, at 948, 177 L. Ed. 2d, at 1030, which consisted of positively VonSteubenesque acts such as dousing the kid with cold water when he refused to get up for school, and making him run extra laps after sports practices, 6 Record 1622; and the claim that his mother's " 'favorite word' "—actually three words—to refer to her sons was scatological, *ante*, at 948, 177 L. Ed. 2d, at 1029 (quoting 2 Record 265).

While the Court takes pains to describe all the elements of Sears' new mitigation theory, down to the silliest, it does not trouble to describe the brutal circumstances of the crime—which are at least just as relevant to assessing whether the different mitigation theory would probably have altered the sentence. But the jury heard all about them. See *Sears* v. *State*, 268 Ga. 759, 759–760, 493 S.E.2d 180, 182 (1997). They heard Sears' confession that he kidnaped, raped, and murdered Gloria Wilbur, a 59-year-old wife and mother. Sears, carrying a briefcase containing various instruments of mayhem—brass knuckles, knives, and handcuffs—and his accomplice, Phillip Williams, were surveying a supermarket parking lot on a Sunday evening in October 1990, looking for a car to steal to drive back home to Ohio from Georgia. As the victim was putting her groceries in the trunk of her car, Sears approached, punched her in the face with his brass knuckles, shoved her into the car, and drove to pick up Williams. Sears then handcuffed her and pulled her into the

[561 U.S. 964]

backseat as Williams drove. After they passed into Tennessee, Sears raped her. Later in the evening, after they had crossed into Kentucky, Sears told Williams to stop the car. Sears forced her, still handcuffed, into the woods by the side of the highway as she begged for her life. After throwing her on the ground, he stabbed her in the neck. In his confession he showed no regret or remorse for his heinous crimes.[5]

I do not know how anyone could disagree with the habeas court's conclusion that it is impossible to say that substituting the "deprived-childhood-*cum*-brain-damage" defense for the "good-middle-class-kid-who-made-a-mistake" defense would probably have produced a different verdict. I respectfully dissent.

---

**5.** The jury also heard from several corrections officers who testified that while Sears was incarcerated awaiting trial and sentencing, he racked up dozens of disciplinary infractions, including assaults on other inmates. " 'Predatory,' " " 'Ii]ncorrigible,' " and incapable of reform was how they described him. 10 *id.,* at 2951–2957; 19 *id.,* at 4868.